UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**FREEDOM MORTGAGE CORPORATION,**

        **Plaintiff,**

- against -

**RICHARD TSCHERNIA**,

        **Defendant.**

---

Case No. 1-20-cv-01206

FIRST AMENDED COMPLAINT

DEMAND FOR JURY TRIAL

## FIRST AMENDED COMPLAINT

Plaintiff Freedom Mortgage Corporation ("Freedom"), through its counsel, Ballard Spahr LLP, brings this First Amended Complaint against Defendant Richard Tschernia ("Tschernia") setting forth multiple claims under New York common law and states as follows:

### PARTIES

1. Freedom is a corporate entity, incorporated in New Jersey, with a principal place of business located at 907 Pleasant Valley Ave., Suite 3, Mount Laurel, New Jersey 08054.

2. Freedom is a licensed mortgage company in New York with extensive operations in New York, including a branch located at 175 Pinelawn Road, Suite 400, Melville, New York 11747.

3. Richard Tschernia is an individual, and a former Freedom employee, who is now employed by CrossCountry Mortgage, Inc. ("CrossCountry"). Based on information and belief, Tschernia resides at 140 Hewlett Avenue, Point Lookout, New York 11569.

### JURISDICTION AND VENUE

4. Jurisdiction in this matter is premised on 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and, as set forth below, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Venue is proper in this district because the parties contractually agreed to this venue and venue is otherwise appropriate in this venue pursuant to 28 U.S.C. § 1391(b)(3).

**FACTUAL ALLEGATIONS**

6. In this action, Freedom seeks injunctive and other equitable relief to prevent and restrain Tschernia from violating the restrictive covenants contained within his Employment Agreement.

7. Freedom also seeks damages, costs, and attorneys' fees it has incurred because of Tschernia's tortious conduct and breach of his Employment Agreement and the Asset Purchase Agreement from the sale to Freedom of a business that Tschernia was a shareholder as described herein.

8. Tschernia is a licensed mortgage loan originator who began working in the mortgage industry in Long Island, New York in or about 1985.

9. In 2008, Tschernia became one of five shareholders in Continental Home Loans, Inc. ("CHL"), a New York Corporation which was located in Melville, New York and engaged in the business of originating mortgage loans.[1]

10. Freedom sought to purchase CHL by way of asset purchase due, in part, to its police and fire union business.

11. A number of "877", "800", and "857" (designated by area codes) phone numbers ("Phone Numbers") were assigned to separate police and fire unions and used in advertisements including monthly and yearly calendar books directed at specific police and fire unions.

12. A toll-free number (800-462-8178) ("800 Number") was used in CHL's ongoing business and then at Freedom after the sale of CHL's assets to Freedom.

---

[1] CHL has since dissolved and is no longer a going concern.

13. Another phone number, (718-639-5626) ("718 Number"), was also used in CHL's ongoing business and then at Freedom after the sale of CHL's assets to Freedom.

14. The Phone Numbers, the 718 Number, and the 800 Number were used in CHL's ongoing business with the police and fire unions as well as with other lead sources and customers for CHL's benefit.

15. This practice began at CHL and continued after Freedom purchased CHL by way of asset purchase.

16. Freedom paid for the advertisements in question which contained the Phone Numbers, the 718 Number, and the 800 Number.

17. The assignment of separate phone numbers to each individual union provided a way for Freedom to keep track of the source of its police and fire business.

18. Many, if not all, of the Phone Numbers and the 718 Number were forwarded to the 800 Number by Tschernia while at CHL and then while he was employed by Freedom. Freedom was not aware of this practice until after Tschernia left employment with Freedom.

19. Based on the unique nature of and marketing strategies which included the Phone Numbers, the 718 Number, and the 800 Number, there was immense value derived from them as assets.

## SALE OF CHL TO FREEDOM

20. CHL was successful and on or about May 30, 2014, Tschernia and the other shareholders in CHL signed an Asset Purchase Agreement ("APA"), selling certain CHL assets including, but not limited to, its intangible assets and professional goodwill to Freedom.

21. Part of the purchase price of CHL was allocated to intangibles including goodwill. Tschernia received 5% of the Purchase Price.

22. Additionally, as part of the APA, CHL and Tschernia were required to transfer all phone numbers used in CHL's then ongoing business operations to Freedom including the Phone Numbers, the 718 Number, and the 800 Number used to advertise and generate business.

23. As part of the APA, Tschernia also agreed in Section 4.12 that he would provide Freedom with good and valid title to the "Purchased Assets."

24. "Purchased Assets" was defined in the APA to mean "all of the Seller's right, title and interest in and to and under all Assets and Properties of Seller primarily related to, used or held for use in, or otherwise necessary for, the conduct of the Business as a going concern" as well as "to the extent transferable, registrations…"[2]

25. "Assets and Properties" was defined in the APA to mean "all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including cash, cash equivalents, investment assets, accounts and notes receivable, chattel paper, documents, instruments, licenses, contracts, general intangibles, real estate, equipment, inventory, goods and Intellectual Property Rights."

26. Tschernia was a party to the APA and therefore, knew that he was required to transfer all assets used by CHL in the course of its business to Freedom.

27. The Phone Numbers, the 718 Number, as well as the 800 Number fall within the definitions of Purchased Assets and/or Assets and Properties in the APA as they were "primarily related to, used or held for use in, or otherwise necessary for, the conduct of the Business."

---

[2] "Business" is defined in the APA as Mortgage Loan origination and servicing business of the Seller.

28. In order to accomplish the transfer of CHL's goodwill and Purchased Assets (as defined in the APA) to Freedom, Tschernia and the other shareholders signed employment agreements.

29. Tschernia agreed, in Section 6.1(a) of that Employment Agreement to continue to work for Freedom as an employee and to not compete with Freedom for a period of two years after he stopped working for Freedom.

30. Tschernia's Employment Agreement ("Employment Agreement") is dated September 15, 2014.

31. Specifically, Section 6.1(a)(i) of the Employment Agreement provides that:

> (i) Except as otherwise permitted under the APA … the Executive shall[3], and shall not permit any of their respective "Affiliates" (as such term is defined in the APA) to, directly or indirectly, (i) engage in or assist others in engaging in the "Restricted Business[4]" (as such term as defined in the APA); or (ii) have an interest in any "Person" (as such term is defined in the APA) that engages directly or indirectly in the Restricted Business in the United States in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, in each case, during the Restricted Period[5] provided that the Company is in material compliance with the terms of the APA and this Agreement…

---

[3] Section 6.1(a)(i) says the Executive "shall" compete, however this is clearly a Scrivener's error and should read "shall not" compete. Email negotiations of the agreement reflect that this clause was intended to track the corresponding language in the APA which states "Neither Executive nor any shareholder shall." The shareholder language was removed from the Employment agreement as it was inapplicable, resulting in Section 6.1 saying "shall" instead of "shall not" as the parties had intended. The intent to include the word "not" is further supported by the fact that the non-solicit provisions in Section 6.1(a)(ii) and (iii) includes the same language with the word "not."

[4] "Restricted Business" is defined in the APA to be the commercial and residential mortgage business, subject to certain carve-outs which are not applicable here.

[5] "Restricted Period" is defined in the Employment Agreement to be the term of the Agreement and the two year period immediately following the Executive's termination of employment with the Company.

32. The Employment Agreement also prohibited Tschernia from soliciting Freedom's employees and customers during the same two year time period. Specifically, the Employment Agreement provides in sections 6.1(a)(ii) and (iii) that:

> (ii) During the Restricted Period, the Executive shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any employee of Company or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 6.1(a) shall prevent the Executive or its Affiliates from hiring (i) any employee whose employment has been terminated by Company other than for Cause or (ii) after one (1) year from the date of termination of employment, any employee whose employment has been terminated by the employee.
>
> (iii) During the Restricted Period, the Executive shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients, business partners or customers of Company or potential clients, business partners or customers of Company for purposes of diverting their business or services from Company.

33. Section 4.12 of the APA further specified that "[t]he Purchased Assets comprise all of the tangible and intangible assets, properties and rights of every type and description used in or necessary to the operation of the Business by Buyer following the Closing."

34. Section 6.10 of the APA required that Tschernia, at Freedom's request, execute and deliver "such other and further instruments of conveyance, assignment, transfer and consent" as Freedom or its counsel might require to effectuate the transfer of the Purchased Assets.

## FRAUDULENT FAILURE TO TRANSFER ASSETS

35. Notwithstanding his signing the APA and the Employment Agreement, and accepting payment under both agreements wherein he represented that he would transfer CHL's goodwill and the Purchased Assets to Freedom and comply with the non-compete provisions, Tschernia never intended to refrain from competing with Freedom or to provide Freedom with the

benefit of its bargain for the purchase of CHL's Purchased Assets and goodwill including, but not limited to, the 718 Number and the 800 Number being utilized by CHL's ongoing business at the time of the sale.

36. After the closing, notwithstanding the agreement to transfer all of the Purchased Assets and goodwill of CHL to Freedom, Tschernia never intended to transfer certain Purchased Assets or goodwill to Freedom including the 800 Number and the 718 Number.

37. Instead, Tschernia attempted to keep the 718 Number and the 800 Number registered in his own name in an effort to hide from Freedom that he intended to keep them for his own personal benefit and in violation of the APA and his Employment Agreement and in order to defraud Freedom.

38. In fact, despite being requested to do so by Freedom, to date Tschernia has failed to transfer title, ownership and registration to Freedom of the 800 Number and the 718 Number that had been used by CHL as an integral part of its ongoing daily business operations to solicit business from police and fire union members and other customer bases.

39. Tschernia was a party to the APA and never attempted to bargain with Freedom to keep any of the Phone Numbers, the 718 Number, or the 800 Number associated with CHL's business. Neither the 718 Number nor the 800 Number is listed in Schedule 2.1(b) of the APA which includes assets excluded from the purchase of CHL by Freedom.

40. Instead, Tschernia appropriated the 718 Number and the 800 Number, without Freedom's knowledge, to take them and the goodwill associated with them with him when he left Freedom's employ.

41. On or about September 27, 2018, Freedom elected not to renew Tschernia's Employment Agreement. His employment with Freedom therefore terminated on October 31, 2018.

42. In early October of 2018 while preparing for Tschernia's departure, Freedom became aware that the 800 Number, specifically, had not been transferred to Freedom's control.

43. As a result, Freedom asked Tschernia to transfer the 800 Number to Freedom and he verbally agreed to do so. At that time, Tschernia verbally admitted that the 800 Number had been sold to Freedom as part of the APA.

44. However, at this same meeting, Tschernia stated that he had been telling the unions through which he had received a significant portion of his business at CHL and then at Freedom that he was going to be leaving Freedom and would be contacting them when he was settled at a new company so that he could work with them there. This was the same union business that Tschernia had sold to Freedom as part of the Purchased Assets under the APA.

45. Later that same month, Tschernia recanted his prior verbal agreement and admission and instead stated that the 800 Number belonged to him personally and that he intended to retain it following his departure from Freedom.

46. On October 31, 2018, Freedom's in-house counsel sent a letter to Tschernia, via the designated Shareholder Representative, as required by the APA, demanding transfer of 800 Number. A true and correct copy of that letter is attached hereto as Exhibit A.

47. Upon separating from employment with Freedom, Tschernia caused the 800 Number to be forwarded away from Freedom and to Freedom's competitors until Freedom confronted him about forwarding the 800 Number at which point he forwarded the number back to Freedom.

.

48. The Phone Numbers, which were assigned to certain police and fire unions and which were used to generate business for Freedom, were forwarded by Tschernia to the 800 Number in question and were therefore, also diverted from Freedom to competitors for a certain period of time by Tschernia after he left Freedom's employment until Freedom became aware of same and stopped the forwarding of the Phone Numbers to the 800 Number.

49. Additionally, upon information and belief, the 718 Number has not been returned to Freedom to date.

50. Upon information and belief, Freedom lost business as a result of Tschernia misappropriating the 800 Number and the 718 Number.

51. In November of 2018, Tschernia requested that he be released from the non-compete and non-solicit provisions of the Employment Agreement.

52. At no time since his separation from Freedom to the date of this filing has Tschernia's New York mortgage banking license been linked to any entity.

53. As such, any referral of business by way of the 800 Number, the 718 Number, or of the Phone Numbers improperly forwarded by Tschernia wherein he is or was involved in offering or negotiating the terms of a mortgage and thereafter collected a fee for same is likely mortgage activity being done without a license and/or constitutes the collection of a fee for unlicensable activity further supporting Freedom's position that Tschernia sought to avoid compliance with his contractual obligations.

**UNLAWFUL COMPETITION**

54. In late December of 2019, Tschernia began working for CrossCountry as a Senior Vice President of Affinity Lending in a loan-origination capacity in Melville, New York, less than three miles from the location where he had worked for Freedom.

55. Upon information and belief, CrossCountry is, and at all relevant times was, an Ohio for-profit corporation conducting business as a licensed mortgage banker and licensed mortgage broker in New York. Its corporate headquarters is located at 6850 Miller Road, Brecksville, Ohio 44141.

56. CrossCountry is a direct competitor of Freedom in the New York market. CrossCountry is licensed in all fifty (50) states, including New York, and operates and/or maintains branches in New York.

57. After starting his employment at Cross-Country, Tschernia began using the 800 Number that had been sold to Freedom (which had the 718 Number and the Phone Numbers forwarded to it) to originate mortgage loans on behalf of CrossCountry.

58. Based on information and belief, callers to this number were told they were calling CrossCountry even though all of the numbers belonged to Freedom.

59. Freedom is also informed and believes that following the termination of his employment with Freedom while receiving calls on the 800 Number, the 718 Number, and the Phone Numbers, Tschernia was indirectly taking loan applications for CrossCountry.

**DEMAND FOR INDEMNIFICATION**

60. As part of the transfer of the Purchased Assets, CHL also transferred many of the loans it owned to Freedom.

61. Pursuant to the APA, CHL and Tschernia made representations related to the loans that were transferred to Freedom.

62. For instance, CHL and Tschernia represented that the loans which were transferred complied with certain requirements, including, but not limited to, underwriting requirements as set forth in Section 4.20 of the APA.

63. Loans that did not meet those requirements were considered defective ("Defective Loans").

64. Section 9.1(a)(ii) of the APA states:

> (a) Representations and Warranties. The representations and warranties made by any Party in this Agreement shall survive the execution and delivery of this Agreement for a period of twenty-four (24) months after the Closing Date, and thereafter shall have no further force or effect, except that the representation and warranties set forth in:
>
> …
>
> (ii) Section 4.18 (Compliance with Laws; Permits), Section 4.19 (Servicing Matters) and Section 4.20 (Mortgage Loans and Loan Documents) shall survive until the third (3rd) anniversary of the Closing Date; and
>
> …

65. Section 9.1(c) states "Notwithstanding anything to the contrary herein, any claim asserted in good faith pursuant to Section 9.7 or Section 9.8 prior to the expiration of the applicable survival period set forth in this Section 9.1, together with the applicable representations, warranties, covenants and agreements, shall survive until such claim is fully and finally resolved.

66. Section 9.2 of the APA requires that Tschernia indemnify Freedom for certain claims, including the Defective Loans:

> From and after the Closing and subject to the limitations set forth in this Article IX, the Seller and the Shareholders shall jointly and severally indemnify, defend and hold harmless Buyer, and its Affiliates and Representatives (each a "Buyer Indemnified Party") from and against any and all claims, losses, damages, diminution in value, Liabilities, deficiencies, Taxes, penalties, assessments, obligations or expenses of any kind or type, including reasonable legal fees and expenses, but excluding any punitive damages (except to the extent punitive damages are owed by any Indemnified Party (defined below) to a third party with respect to a Third-Party Claim) (each a "Loss") incurred by any Buyer Indemnified Party based upon, resulting from or arising out of:

(a) any inaccuracy in or breach of any representation or warranty of the Seller or the Shareholders contained in this Agreement, any other Transaction Document or any certificate or other instrument delivered by or on behalf of the Seller or the Shareholders pursuant to this Agreement;

(b) any breach of any covenant, agreement or obligation to be performed by the Seller or the Shareholders pursuant to this Agreement or any other Transaction Document;

67. Section 9.8 of the APA states:

Indemnification Procedures – Direct Claims. In any case in which an Indemnified Party seeks indemnification hereunder which is not subject to Section 9.7 because no Third-Party Claim is involved, the Indemnified Party shall notify the Indemnifying Party in writing as promptly as reasonably practicable of any Losses which such Indemnified Party claims are subject to indemnification under the terms hereof. Subject to the limitations otherwise set forth in this Article IX, the failure of the Indemnified Party to exercise promptness in such notification shall not amount to a waiver of such claim unless and to the extend the resulting delay materially prejudices the position of the Indemnifying Party with respect to such claim.

68. After entering into the APA, Freedom became aware that multiple loans transferred from CHL did not meet underwriting requirements or were otherwise defective in violation of the representations contained in Section 4.20 of the APA.

69. Freedom suffered Losses on the Defective Loans including, but not limited to, repurchase costs, fees, and refinancing costs as a result of the violations of the APA and misrepresentations made regarding the loans in question.

70. CHL and Tschernia are required under the APA to indemnify Freedom for Losses related to the Defective Loans.

71. Freedom has sent the appropriate notices for indemnification to CHL and its shareholders via the Shareholder Representative as provided for in the APA.

72. The notices under Section 9.8 were sent to Mike McHugh in 2015 for a number of loans which were defective and for which Freedom sought indemnification from CHL and the Shareholders.

73. As such, the indemnification notices were sent within the three year survival period contemplated in Section 9.1 of the APA.

74. To date, Freedom has not been indemnified by Tschernia for the loss the Defective Loans as required under the APA.

75. CHL and certain other Shareholders were released from this indemnification obligation under a Release Agreement dated September 27, 2018 ("Release Agreement").

76. The provisions regarding the release of indemnification claims in the Release Agreement were only applicable if the individuals did not challenge certain terms of their Employment Agreements, including certain restrictive covenants.

77. Because Tschernia is challenging the validity of those restrictive covenants in his Employment Agreement, he has not been released from the indemnification obligations in the APA as set forth in the Release Agreement.

78. This action seeks to stop Tschernia's unlawful activities; to deprive him of the fruits of those activities; and to remedy the damages, fees, and costs that his actions have imposed on Freedom to date.

## COUNT ONE

## UNJUST ENRICHMENT

## UNDER NEW YORK COMMON LAW

79. Freedom incorporates the allegations in the foregoing paragraphs 1-78 as if fully set forth herein.

80. Defendant Tschernia fraudulently obtained, received and benefitted, at Freedom's expense, from: (i) payment for the Purchased Assets and goodwill in CHL including, but not limited to, the 800 Number, the 718 Number, and the Phone Numbers taken by him or diverted away from Freedom by him; and (ii) income from commissions on loans obtained by unlawfully violating the restrictive covenants in the Employment Agreement in an amount to be proven at trial;

81. By virtue of the foregoing, Tschernia has been unjustly enriched in an amount to be proven at trial.

82. Equity requires that Tschernia provide restitution to Freedom for the unjust enrichment Tschernia received.

# COUNT TWO
# CONVERSION/MISAPPROPRIATION
# UNDER NEW YORK COMMON LAW

83. Freedom incorporates the allegations in the foregoing paragraphs 1-82 as if fully set forth herein.

84. Defendant Tschernia intended to and did interfere with Freedom's right of possession of the 800 Number and the 718 Number when he transferred them to himself or had them forwarded to himself or others not employed by Freedom after leaving employment with Freedom and while working for competitors of Freedom. He also interfered with Freedom's right of possession of the Phone Numbers when he had them forwarded to himself or others not employed by Freedom after leaving employment with Freedom and while working for competitors of Freedom;

85. As a direct and proximate result of Tschernia's conversion and/or misappropriation, Freedom has been caused damages in an amount to be proven at trial.

# COUNT THREE

# FRAUD

# UNDER NEW YORK COMMON LAW

86. Freedom incorporates the allegations in the foregoing paragraphs 1-85 as if fully set forth herein.

87. Tschernia falsely represented to Freedom that he would abide by the non-compete provisions in the Employment Agreement, notwithstanding that he never intended to comply with those provisions.

88. Tschernia misrepresented to Freedom that he was selling the Purchased Assets and goodwill he had acquired in CHL, including, but not limited to, the 800 Number and the 718 Number referenced above, to Freedom when he nonetheless intended to keep and use those assets and goodwill to compete with Freedom.

89. At the time that Tschernia made such misrepresentations about the phone numbers and the asset purchase deal, he knew they were materially false and made them with the intent to deceive and defraud Freedom so as to induce Freedom to pay him a portion of the Purchase Price.

90. Freedom was, in fact, deceived by Tschernia's misrepresentations that he was transferring the 800 Number and 718 Number as part of the Purchased Assets and goodwill and would abide by his non-compete when it paid Tschernia for same.

91. Further, Tschernia affirmatively concealed the fraudulent nature of his representations, by leading Freedom to believe he was using the 800 Number and 718 Number to originate loans for Freedom, while keeping control of them for himself and paying the bills himself

without seeking reimbursement so that Freedom's accounts-payable department would not identify that the number had failed to be transferred.

92. As a result of his deception, Tschernia received payments in exchange for Purchased Assets and goodwill that he never intended to transfer and never, in fact, transferred.

93. Freedom was defrauded by Tschernia's false representations and has suffered harm as a result.

94. As a direct and proximate result of Tschernia's fraudulent statements and concealment of the truth, and in reasonable reliance on Tschernia's purported transfer of the Purchased Assets and goodwill, Freedom paid him significant sums of money under the APA. Freedom is entitled to disgorgement of the profits from the Purchased Assets and goodwill which were inappropriately kept by Tschernia.

95. Additionally, Freedom is entitled to be repaid the amount that Tschernia was paid for the Purchased Assets and goodwill he never intended to transfer or actually transferred, plus interest thereon.

96. As a direct and proximate result of Tschernia's fraudulent statements and concealment of the truth, and in reasonable reliance on Tschernia's representation that he would be bound by the non-compete and non-solicit clauses in his Employment Agreement, Freedom has been damaged in an amount to be proven at trial.

**COUNT FOUR**

**UNFAIR COMPETITION**

**UNDER NEW YORK COMMON LAW**

97. Freedom incorporates the allegations in the foregoing paragraphs 1-96 as if fully set forth herein.

98. Tschernia is engaged in direct competition with Freedom.

99. Freedom derived a competitive advantage from using the Phone Numbers, the 718 Number, and the 800 Number to generate business from the police and fire unions.

100. Tschernia deceived Freedom in bad faith by misappropriating the Phone Numbers, the 718 Number, and the 800 Number.

101. After Tschernia deceived Freedom and misappropriated the Phone Numbers, the 718 Number, and the 800 Number, Tschernia used that intangible property belonging to Freedom to compete directly with Freedom.

102. Such actions constitute unfair competition, and as a proximate result of this unfair competition Freedom has been damaged in an amount to be proven at trial.

## COUNT FIVE
## BREACH OF CONTRACT
## UNDER NEW YORK COMMON LAW

103. Freedom incorporates the allegations in the foregoing paragraphs 1-102 as if fully set forth herein.

104. Tschernia and Freedom entered into the APA.

105. Freedom fulfilled all of its obligations under the APA, including, but not limited to, compensating Tschernia for the sale of the Purchased Assets and goodwill in CHL.

106. Tschernia breached the APA by failing to transfer the Purchased Assets and goodwill in CHL, namely, the 800 Number and 718 Number which were being used in the course of CHL business, to Freedom and instead keeping them and using them to compete against Freedom.

107. As a proximate result of Tschernia's breach of the APA in failing to transfer Purchased Assets and goodwill, Freedom has incurred and will continue to incur monetary losses in an amount to be proven at trial.

108. Tschernia additionally breached the APA by failing to indemnify Freedom for the losses incurred in connection with the Defective Loans.

109. As a proximate result of Tschernia's breach of the APA by failing to indemnify Freedom, Freedom has incurred and will continue to incur monetary losses in an amount to be proven at trial.

110. Tschernia and Freedom also entered into the Employment Agreement.

111. Freedom fulfilled all of its obligations under the Employment Agreement, including, but not limited to, paying Tschernia wages according to the terms of the Employment Agreement during the term of his employment.

112. Tschernia breached the Employment Agreement by working on behalf of a competitor, namely CrossCountry Mortgage, Inc., originating loans, either directly or indirectly, less than three miles from where he worked for Freedom, in violation of the non-compete that he agreed to in the Employment Agreement.

113. As a proximate result of Tschernia's breach of the Employment Agreement, Freedom has incurred and will continue to incur monetary losses in an amount to be proven at trial.

114. As a result of Tschernia's breaching the restrictive covenants in the Employment Agreement, as described above, Freedom has suffered and continues to suffer immediate, permanent, and irreparable harm.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF:

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in favor of Plaintiff for each and every claim asserted above, and grant relief and an award, as follows:

(1) damages for past conduct as set forth above in an amount to be proven at trial, but currently estimated at $19,011,000.00;

(2) pre- and post-judgment interest as allowed by law;

(3) attorney fees, litigation expenses and costs incurred in bringing this action;

(4) an Order declaring that the restrictive covenants contained within Tschernia's Employment Agreement are enforceable;

(5) a permanent injunction barring Tschernia from continuing to compete with Freedom or solicit its employees or customers in violation of Tschernia's Employment Agreement;

(6) an Order disgorging the profits of Tschernia and directing entry of judgment for a like amount against Tschernia and in favor of Freedom; and

(7) such other and further relief as the Court deems just and proper.

Dated: June 23, 2020

Respectfully submitted,


By: */s/ Christopher J. Kelly*
Christopher J. Kelly (CK-3191)
Louis L. Chodoff (admitted *pro hac vice*)
Tara L. Humma (admitted *pro hac vice*)
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
(856) 761-3400
kellyc@ballardspahr.com
chodoffl@ballardspahr.com
hummat@ballardspahr.com