UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Freedom Mortgage Corporation,

                Plaintiff,

      –v–

Richard Tschernia,

                Defendant.

20-cv-1206 (AJN)

MEMORANDUM OPINION & ORDER

ALISON J. NATHAN, District Judge:

      Richard Tschernia and his business partners sold their successful mortgage loan business to Freedom Mortgage Corporation. Tschernia continued working for Freedom for four more years until Freedom elected not to renew his contract. He then went to work for one of Freedom's rivals, taking with him two telephone numbers that Freedom alleges were included in the sale and that it had used in its advertisements. Freedom sued Tschernia, claiming that he breached the terms of the sale agreement and misappropriated the phone numbers. Tschernia moves to dismiss. The Court concludes that Freedom plausibly alleges breach of contract and unfair competition, but that its other claims reach too far. It thus grants the motion in part and denies it in part.

**I.    Background**

      For purposes of this motion, the Court takes as true all factual allegations in the first amended complaint ("FAC"), Dkt. No. 25, and draws all reasonable inferences in Freedom's favor. Because Freedom asserts claims under the contracts governing its purchase of Tschernia's

company and a subsequent release, the Court considers those, too. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Tschernia began working in the mortgage industry around 1985. FAC ¶ 8. In 2008, he became one of five shareholders in Continental Home Loans, Inc., a mortgage loan company based in Melville, New York. *Id.* ¶ 9. The company was successful, and in May 2014 agreed to sell substantially all of its assets to Freedom, including its intangible assets and goodwill. *Id.* ¶ 20; *see* Asset Purchase Agreement, Dkt. No. 27-1, at 11–12. Tschernia was a party to the purchase agreement and received 5% of the purchase price based on his ownership in the company. FAC ¶¶ 21, 26; *see* Asset Purchase Agreement at 1. Freedom purchased Continental in part because of Continental's police and fire union business. FAC ¶ 10. The asset purchase agreement included a provision barring the Continental shareholders from competing with Freedom for five years after the sale. Asset Purchase Agreement at 52–53; *see* FAC ¶ 31 n.3.

In an employment agreement accompanying the sale, the Continental shareholders agreed that they would continue working for Freedom for a period after the sale. FAC ¶ 29; *see* Employment Agreement, Dkt. No. 27-3. The employment agreement also included provisions barring Tschernia from working for any of Freedom's competitors anywhere in the country or soliciting its clients for a period of two years after the end of his employment with Freedom. FAC ¶¶ 29–32.

Following the sale, Tschernia continued working for Freedom until Freedom elected not to renew his contract in September 2018. *Id.* ¶ 41. During the course of preparing for Tschernia's departure, Freedom leaned that he retained control over an 800 telephone number that both Continental and Freedom had used in their business. *Id.* ¶¶ 12, 42. When Freedom confronted Tschernia, he agreed to give up the number. *Id.* ¶¶ 43, 45–46. Freedom later learned

that Tschernia had also retained control over another 718 number. *Id.* ¶¶ 48–49. These numbers had appeared in Continental's and Freedom's advertisements, including marketing materials directed at their police and fire union clients. *Id.* ¶¶ 11–14. Instead of returning those numbers to Freedom when his employment ended, Tschernia forwarded them (and some other numbers Freedom had used) to his new employer so that prospective clients' calls would continue to reach him, rather than Freedom. *Id.* ¶¶ 47–48. He also told some of Freedom's union clients to contact him once he moved to a new company. *Id.* ¶ 44. Tschernia has since forwarded the 800 number back to Freedom but has not done so with the 718 number. *Id.* ¶¶ 47, 49.

In December 2019, Tschernia began working CrossCountry—one of Freedom's competitors—as a Senior Vice President of Affinity Lending at an office less than three miles from where he worked for Freedom. *Id.* ¶ 54. He continued to use the 800 and 718 numbers at his new job to originate mortgage loans on behalf of CrossCountry. *Id.* ¶¶ 57–59.

Freedom also alleges that some of the loans it acquired from Continental under the asset purchase agreement were defective. *Id.* ¶¶ 68–72. It does not allege any details as to which loans were defective or why they were defective. Although Freedom and the Continental shareholders agreed to a mutual release in 2018, the release stated that it would only be effective as to shareholders who did not challenge the restrictive covenants contained in the employment agreement. *Id.* ¶¶ 75–77.

**II.    Legal Standard**

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When determining whether a complaint states a claim, a court accepts as true all allegations in the complaint and draws all reasonable inferences in favor of the non-moving party. *Id.* For purposes of a motion to dismiss, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.* at 153 (cleaned up). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous. *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016).

**III.   Discussion**

    **A.   Breach of the Asset Purchase Provisions**

The parties' dispute in this case centers on Tschernia's retention of the phone numbers. Freedom alleges that it purchased those numbers along with Continental's other assets under the asset purchase agreement. The agreement defines "purchased assets" as all Continental's assets "primarily related to, used or held for use in, or otherwise necessary for, the conduct of the Business as a going concern, including [twelve categories of assets]; provided, that the Purchased Assets shall not include any Excluded Assets." Asset Purchase Agreement at 11–12. Excluded assets are defined in a separate schedule. *See id.* The parties agree that neither the enumerated categories of documents listed as purchased assets nor the schedule of excluded

assets specifically mention telephone numbers.  In Tschernia's view, the phone numbers are not included in the sale because they are not expressly identified as purchased assets.  In Freedom's, the phone numbers are included because they are not expressly excluded.

Under New York law, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.  The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (cleaned up).  Thus, the Court must begin with the plain meaning of the contract's terms.  *Id.*  The Court concludes that those terms favor Freedom's interpretation or are, at most, ambiguous.

The contract says that purchased assets are "*all*" assets related to or necessary for the operation of the business as a going concern other than those excluded.  Asset Purchase Agreement at 11–12 (emphasis added).  Phone numbers featured in Continental's advertisements and used for its business plainly relate to the operation of the business.  Were it not for the next clause of that sentence, the Court could stop there.  However, the contract goes on to state that the purchased assets are all assets "*including*" those listed in twelve enumerated categories.  *Id.* (emphasis added).  The Court must therefore determine what "including" means here.  Tschernia says it means *only* the enumerated categories of assets.  Freedom says it means those categories of assets *among others*.

As the Supreme Court has held (and a passing familiarity with the English language confirms), "to include" may refer to some items within a larger set.  *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001).  "To 'include' is to 'contain' or 'comprise as part of a whole.'" *Id.*  Often, "to include" is used to provide illustrative examples.  *See id.*  Thus, one could say that common-law torts include conversion, unfair competition, and fraud.  No one would understand

5

that statement to mean that those are the only common-law torts.  Freedom's reading of the contract is plausible, if not inescapable, based on the plain meaning of the contract's terms.

The context offers little help for Tschernia either.  To be sure, the enumerated items listed as "include[ed]" in the purchased assets are extensive, which might suggest that the list was intended to be exhaustive.  However, in other instances in the same provision, the word "including" is plainly illustrative.  For example, purchased assets include "the platform and content of Seller's websites, including domain names."  Asset Purchase Agreement at 12.  One cannot reasonably read this language to mean that Freedom purchased only domain names, and not the remainder of the platform and content of the websites.  The usage of the word "including" in other places in the definitions of purchased assets suggests that the parties did not intend for it to refer to an exhaustive list.  At the very least, the contract is ambiguous, and its interpretation may turn on evidence of custom and usage.  *See L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

Considering both the contract's plain language and the broader context, the Court cannot conclude that the asset purchase provisions unambiguously foreclose Freedom's claims. The Court thus concludes that Freedom has stated a claim for violation of the asset purchase provisions.

      **B.**      **Breach of the Restrictive Covenants**

Under New York law, "negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 592 (N.Y. 1976).  The standard for reasonableness varies depending on whether the restrictive covenant relates to the sale of a business or appears in an ordinary employment contract.  "The restraint imposed by a sale-of-business covenant must

be no 'more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought.'" *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 28 (2d Cir. 1987) (quoting *Purchasing Associates, Inc. v. Weitz*, 196 N.E.2d 245, 247 (N.Y. 1963). Other restrictive covenants between employers and employees are subject to even more demanding scrutiny. "In this context a restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (quoting *Reed, Roberts*, 353 N.E.2d at 593).

The agreements Freedom and Tschernia executed when Freedom acquired Continental include two separate restrictive covenants. Tschernia's employment at CrossCountry runs afoul of only one of them. First, the asset purchase agreement included a provision barring him from competing with Freedom for five years after the sale. Asset Purchase Agreement at 52–53; *see* FAC ¶ 31 n.3. No problem here, because the sale concluded in May 2014 and Tschernia started working for CrossCountry in December 2019. FAC ¶¶ 20, 54. Second, the employment agreement governing Tschernia's work at Freedom after the sale forbid competition and solicitation for two years following his employment.[1] *Id.* ¶¶ 29–32; Employment Agreement § 6.1(a)(i). Because Tschernia's employment at Freedom ended in 2018, Freedom alleges that he violated this second restrictive covenant.

---

[1] The Court has no trouble concluding that Freedom plausibly alleges that the statement that "the Executive *shall* . . . engage in or assist others in engaging in the 'Restricted Business'" is a scrivener's error, given the parallel language in the following paragraph. Employment Agreement § 6.1(a)(i) (emphasis added); *see id.* at § 6.1(a)(ii). However, the Court concludes that Freedom fails to state a claim regardless.

The Court concludes that this restrictive covenant is appropriately considered under the more exacting scrutiny applicable to employment contracts; however, it would be unreasonable under either framework. Freedom's legitimate interest in the enjoyment of the goodwill it purchased from Continental received more than adequate protection under the restrictive covenant in the asset purchase agreement. That agreement guaranteed it a full five years of protection from competition anywhere in the country. The restrictive covenant in the employment agreement, which would bar Tschernia from working whether he left Freedom after five years or after twenty-five years, lacks a reasonable nexus to its purchase of Continental. *See Lodging Sols., LLC v. Miller*, No. 19-cv-10806 (AJN), 2020 WL 6875255, at *6 (S.D.N.Y. Nov. 23, 2020) (citing *Reed, Roberts*, 353 N.E.2d at 593). The restrictive covenant in the employment agreement is exceptionally broad. It covers the whole of the United States and forbids even remote affiliation with any company involved in the commercial or residential mortgage business. *See* Employment Agreement § 6.1(a)(i); Asset Purchase Agreement at 12. When considered alongside the restrictive covenant in the asset purchase agreement, it is not appropriately tailored to protect any legitimate interest.

Further counseling against enforcement of the restrictive covenant here is that "New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (internal quotation marks omitted) (collecting cases). An employer who fires an employee without cause "destroys the mutuality of obligation" that supports enforcement of even otherwise reasonable restrictive covenants. *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 397 N.E.2d 358, 361 (1979). Freedom chose to terminate Tschernia's employment

four years after it purchased Continental.  Under New York law, it cannot now complain when Tschernia seeks to ply his trade elsewhere.

Because the restrictive covenant in the employment agreement is unenforceable in these circumstances, Freedom fails to state a claim for its breach.

### C.     Breach of the Indemnity Provisions

Section 9.2 of the asset purchase agreement requires Continental and its shareholders to indemnify Freedom for any breach of warranties as to the mortgage loans Freedom acquired in the sale.  FAC ¶ 66.  Freedom alleges that it signed a mutual release with the shareholders, but that the release contains a provision stating that it shall not apply to any shareholder who has challenged the enforceability of the restrictive covenants in the asset purchase agreement or employment agreement.  *Id.* ¶¶ 75–77; Mutual Release Agreement, Dkt. No. 27-4, § 3.  Because Tschernia challenges the enforceability of the non-compete covenant in his employment agreement, Freedom contends that he should thus be liable to indemnify it for defective loans.

The Court has serious doubts about the enforceability of the provision purporting to condition Tschernia's benefits under the mutual release on his acquiescence to unlawful restrictive covenants.  New York courts have recognized "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood."  *Purchasing Assocs.*, 196 N.E.2d at 247.  The Court is skeptical that New York public policy permits an employer to accomplish indirectly by a penalty provision in a separate contract what it plainly cannot do directly.  The provision in the release agreement is exceptionally punitive.  The asset purchase agreement imposes joint and several liability on the former Continental shareholders for any indemnification obligations; yet if a single shareholder challenges one of the restrictive covenants, Freedom would have a claim against that individual shareholder—and that individual

9

shareholder alone—for the full amount of any indemnification obligation.  The result is that Tschernia alone would bear full responsibility for Continental's defective loans despite having received only 5% of the purchase price.  This extreme penalty would subvert the New York public policy against unreasonable restrictive covenants.

The Court need not decide the enforceability of the release conditions, however, because Freedom does not plausibly allege a claim for breach of the indemnity provisions of the asset purchase agreement.  In its complaint, it offers only the conclusory assertion that "multiple loans . . . did not meet underwriting requirements or were otherwise defective in violation of the representations contained in Section 4.20."  FAC ¶ 68.  It does not identify any particular loans or even suggest how many there might be.  It alleges no facts as to how or why these unnamed and unnumbered loans were defective.  And it does not identify the specific loan warranties that it alleges Continental breached.  This sort of bare, "the-defendant-unlawfully-harmed-me accusation" does not satisfy the requirements of Rule 8.  *Iqbal*, 556 U.S. at 678.  The Court thus concludes that Freedom has not stated a claim for breach of the indemnity provisions.

### D.   Unjust Enrichment

To prevail on a claim of unjust enrichment under New York law, "a plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (cleaned up). "Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."  *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009).  "An unjust enrichment claim is not available where it simply duplicates,

or replaces, a conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Tserchnia contends that Freedom's unjust enrichment claims are duplicative of his breach of contract claims. The Court agrees.

Freedom pleads two theories of unjust enrichment. First, it alleges that Tschernia was unjustly enriched because he received payment in the sale for assets including the phone numbers but retained those assets. FAC ¶ 80. Second, it alleges that he was unjustly enriched because he earned commissions on loans obtained by violating the restrictive covenants in the employment agreement. *Id.* Each of these theories stands or falls on the exact same facts as Freedom's contract claims. If the asset purchase agreement did not cover the phone numbers, then Tschernia would not have been unjustly enriched by retaining them. And if Tschernia did not breach or was not bound to the non-compete clause in the employment agreement, then it would not be unjust for him to retain the commissions he earned while working for CrossCountry. "To the extent that these claims succeed, the unjust enrichment claim is duplicative; if [his] other claims are defective, an unjust enrichment claim cannot remedy the defects." *Corsello*, 967 N.E.2d at 1185. In this situation, "[t]he unjust enrichment claim should be dismissed." *Id.*

Freedom contends that its unjust enrichment claim is not duplicative because Tschernia disputes the enforceability of the restrictive covenants, and that it should therefore be allowed to plead it in the alternative. Freedom is correct that the mere existence of a contract does not preclude a claim for unjust enrichment and that courts allow plaintiffs to plead unjust enrichment in the alternative in some situations. *See, e.g.*, *Zuccarini v. Ziff-Davis Media, Inc.*, 762 N.Y.S.2d 621, 622 (App. Div. 2003); *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 236 (S.D.N.Y. 2013). The operative inquiry is whether the claim for unjust enrichment could allow the plaintiff to

11

recover in the event that its contract claim proves unsuccessful. For example, if the statute of frauds barred enforcement of a contract, a plaintiff might still be able to recover under quantum meruit for services they performed. *See Zuccarini*, 762 N.Y.S.2d at 622. This is not such a case. Under both Freedom's theories of unjust enrichment, the benefits Tschernia received would only be unjust if he breached an enforceable contract with Freedom. The Court thus concludes that this claim is duplicative and must be dismissed.

### E. Conversion

The Court next turns to Freedom's tort claims. "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y. 2012) (quoting *Colavito v. New York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006)). New York law permits claims for the conversion of intangible property. *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1278 (N.Y. 2007). However, "an action for conversion can not be validly maintained where damages are merely being sought for breach of contract." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 452 N.Y.S.2d 599, 600 (App. Div. 1982) (mem.); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

The Court concludes that Freedom's claim for conversion, like its claim for unjust enrichment, merely seeks non-contract remedies for a breach of contract. Stated otherwise, because Freedom alleges that Tschernia failed to deliver the phone numbers to Freedom as required under the asset purchase agreement, it does not allege a possessory right or interest in the numbers. *Pappas*, 982 N.E.2d at 580. Freedom alleges that Tschernia never transferred (or indeed intended to transfer) the phone numbers from his own name to Freedom's. FAC ¶¶ 36–

37.  It alleges that "Tschernia has failed to transfer title, ownership and registration to Freedom" of the phone numbers.  *Id.* ¶ 38.  Without title or ownership in the numbers, Freedom lacked the sort of property interest necessary to support a claim for conversion.  As in other cases in which a seller fails to deliver goods bargained for under a contract, the buyer's remedies lie in contract, not in tort.  This claim, too, must be dismissed.

        F.        Fraud

New York law does not recognize a claim for fraud if the only alleged misrepresentation is of a future intent to perform under a contract.  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) ("intentionally-false statements . . . indicating [an] intent to perform under [a] contract . . . [are] not sufficient to support a claim of fraud under New York law"); *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20–21 (App. Div. 1999) ("A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, *i.e.*, when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract."); *McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (App. Div. 1991) (mem.) ("It is well settled that where, as here, a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.").

Freedom contends that Tschernia's conduct amounts to more than breach of contract because it was part of "a calculated scheme to defraud Freedom of assets, leads, and customers." Opp. Br., Dkt. No. 29, at 10.  However, the defendant's level of malice is not the relevant inquiry under New York law.  The only misrepresentations Freedom alleges are that Tschernia "falsely represented to Freedom that he would abide by the non-compete provisions" and promised to sell

13

the phone numbers but "nonetheless intended to keep and use those assets and goodwill to compete with Freedom." FAC ¶¶ 87, 88. As alleged, these are no more than misrepresentations of Tschernia's intent to perform under the asset purchase provisions and restrictive covenants, and thus cannot support a claim for fraud under New York law.

### G. Unfair Competition

Unlike Freedom's other restitution and tort claims, Freedom's claim for unfair competition is not duplicative of its contract claims. "New York courts 'have long recognized two theories of common-law unfair competition: palming off and misappropriation.'" *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 453 (S.D.N.Y. 2014) (quoting *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 (N.Y. 2007)). The misappropriation theory of unfair competition forbids misappropriation of "the results of the skill, expenditures and labors of a competitor." *ITC*, 880 N.E.2d at 858 (quoting *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 203 (N.Y. 1959)). Taking the allegations in Freedom's complaint as true and drawing all reasonable inferences in its favor, Tschernia did just that.

Freedom alleges that it paid for advertisements that included the phone numbers. FAC ¶¶ 11, 16. It used the numbers in the course of its business and derived a competitive advantage from its union clients' familiarity with those numbers. *Id.* ¶ 99. As a result, it alleges, after Tschernia took those numbers with him to CrossCountry, business from callers who intended to reach Freedom instead went to CrossCountry. *Id.* ¶¶ 48, 50, 57–58. This is analogous to other situations in which New York courts have allowed unfair competition claims when defendants have sought to profit off a competitor's goodwill. *See ITC*, 880 N.E.2d at 859. The Court sees little difference between using a phone number advertised as belonging to a competitor and using

a competitor's name to attract customer interest. *See, e.g.*, *Electrolux* 161 N.E.2d at 203. Freedom plausibly alleges that Tschernia misappropriated its goodwill.

This claim is distinct from Freedom's claims for breach of contract. Whether or not the asset purchase provisions included the phone numbers, Tschernia may have engaged in unfair competition if he steered customers trying to call Freedom to a competitor as alleged. Thus, the Court concludes that Freedom states a claim for unfair competition.

## Conclusion

The Court GRANTS Tschernia's motion to dismiss (Dkt. No. 26) as to Freedom's claims for breach of the restrictive covenants, breach of the indemnity provisions, unjust enrichment, conversion, and fraud and DENIES the motion as to Freedom's claims for breach of the asset purchase provisions and unfair competition. The Court DENIES as moot Tschernia's earlier motion to dismiss (Dkt. No. 19) filed before Freedom amended its complaint. The Court will set a status conference by separate order.

This resolves Docket Numbers 19 and 26.

SO ORDERED.

Dated: March 26, 2021
       New York, New York

_____
ALISON J. NATHAN
United States District Judge